GEOFFREY A. NERI (SBN 258802)
  geoff@bnsklaw.com
THOMASIN BERNHARDT (SBN 354173)
  thomasin@bnsklaw.com
BROWN, NERI, SMITH, AND KHAN LLP
11601 Wilshire Blvd., Suite 2080
Los Angeles, CA 90025
Tel: (310) 593-9890

JUSTIN MUNGAI (NY 5514245)
*(*Pro Hac Vice Pending*)
  justin@chaudhrylaw.com
CHAUDHRYLAW PLLC
147 W. 25th Street, 12th Fl.
New York, NY 10001
Tel: (212) 785-5550
Fax: (212) 989-9040

*Attorneys for Plaintiff Laura Byrnes*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA BYRNES,<br><br>            *Plaintiff,*<br><br>      vs.<br><br>MICHELINE PITT and MICHELINE PITT DESIGN, INC., a California Corporation,<br><br>            *Defendants.* | Case No.: 2:26-cv-05893<br><br>**COMPLAINT FOR:**<br>  1.  **BREACH OF CONTRACT**<br>  2.  **DECLARATORY RELIEF**<br><br>**JURY TRIAL DEMANDED** |

- 1 -
COMPLAINT

Plaintiff Laura Byrnes ("Byrnes"), by and through her undersigned attorneys Brown, Neri, Smith & Khan LLP and ChaudhryLaw PLLC, as and for her complaint (the "Complaint") against Micheline Pitt ("Pitt") and Micheline Pitt Design, Inc. (collectively, "Defendants"), respectfully alleges as follows:

**PRELIMINARY STATEMENT**

1.     No good deed goes unpunished.  For nearly a decade, Byrnes served as mentor, employer, and close friend to Pitt, guiding her from an unproven warehouse worker into a central figure at Pin Up Girl, Inc. ("PUG").  Under Byrnes' leadership, PUG grew from a small startup into a successful multi-million-dollar brand known for creativity, craftsmanship, and integrity.

2.     Throughout Pitt's tenure at PUG, Pitt worked under Byrnes' direction—as Creative Director, Production Manager, Assistant Designer, and collaborator across every aspect of PUG's business.  Byrnes elevated Pitt to her second-in-command because Byrnes invested years in her professional development.  Byrnes began to trust Pitt implicitly.  That was a mistake, and Pitt violated Byrnes' trust in the worst way imaginable.

3.     In 2016, Pitt abruptly resigned.  Within months, she launched her own competing brand: Vixen by Micheline Pitt ("Vixen").  Pitt's business was not founded on independent innovation; rather, she built it on the back of PUG, taking PUG's proprietary designs, patterns, production methods, vendor relationships, and even personnel.  What followed was a calculated campaign to tear down the company that had elevated her: interference with PUG's vendors and employees, misappropriation of PUG's creative work, and a coordinated barrage of public disparagement meant to damage Byrnes and clear a path for Vixen to proclaim itself the "new PUG."

4.     Litigation was inevitable.  Pitt sued first; PUG countersued.  The parties battled over copyrights, loyalty breaches, and the ownership of artwork Pitt created while she was a PUG employee.  What started out as a business and employment

- 2 -

COMPLAINT

dispute quickly became personal, with Pitt using the legal system as her weapon of choice to wield against her former mentor.

5.    Every time it seemed as though Byrnes could put these disputes behind her, Pitt would reinitiate litigation for one reason or another.  Her mission was (and remains) clear: she does not want Byrnes to have peace.

6.    Byrnes, on the other hand, has been desperately trying to move on from Pitt.  With each litigation flare up, Byrnes has been the adult in the room who has chosen peaceful resolution over endless fighting.  In February 2019, Byrnes and Pitt executed a settlement agreement ("2019 Agreement") to resolve their employment and IP disputes.  Included within that agreement was a standard anti-disparagement clause.  This should have been the end of all dealings between Pitt and Byrnes, but it wasn't.

7.    On February 19, 2021, Pitt sued Byrnes again.  This time her alleged grievance was that Byrnes had breached the anti-disparagement clause of the 2019 Agreement.  She made this claim knowing that she herself was deploying agents to breach that very same clause she claimed Byrnes breached.  In fact, Byrnes had been enduring sustained bullying and emotional attacks on the internet which Pitt directed through her "not-so-clever" workaround of the anti-disparagement clause—*i.e.*, using proxies.

8.    The straw that broke the camel's back for Byrnes was watching Pitt and her gang of proxies bully and attack someone else.  Byrnes could not live with herself if she did not stand up for this individual.  When Pitt sued Byrnes, Byrnes knew she could counter sue for the disparagement by Pitt's agents.  However, rather than get consumed in litigation again, Byrnes chose to settle the matter and move on with her life.

9.    The parties executed a settlement agreement on October 18, 2021 ("2021 Agreement").  The 2021 Agreement reflects four facts material to this action.  First, Byrnes paid substantial monetary consideration to obtain Pitt's promises under the

COMPLAINT

2021 Agreement, including the non-disparagement covenant.  Second, the parties expressly bargained for and revised the non-disparagement language—first negotiated in the 2019 Agreement—to reach disparagement made "through proxies" in addition to disparagement made directly.  Third, the parties expressly agreed in the contract text that the non-disparagement covenant "does not violate their First Amendment rights and each Party hereby waives any argument to the contrary."  Fourth, on November 5, 2021, the Los Angeles Superior Court entered a stipulated preliminary injunction enforcing the 2021 Agreement's non-disparagement covenant against both parties.  Pitt thus knowingly, for value, and with the benefit of counsel contracted away her right to disparage Byrnes—directly or through proxies—and a court of competent jurisdiction has already enforced that promise.

10.     In February 2025, Pitt resumed her breach of the 2021 Agreement.  On the very same day that Pitt filed her newest ex parte application against Byrnes in the Los Angeles Superior Court—February 7, 2025—individuals connected to Pitt began publishing a coordinated wave of disparaging content about Byrnes and PUG that has continued in the months that followed.  The same-day timing, after approximately three years of relative quiet, is no coincidence.  Accordingly, Byrnes brings this action to enforce the 2021 Agreement's non-disparagement covenant.  Byrnes also seeks a narrow declaratory ruling confirming that her own January 2025 TikTok content—which does not name Pitt—does not breach the 2021 Agreement.

## **JURISDICTION**

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because the action is between a citizen of a foreign state and a citizen of a U.S. state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendant resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

COMPLAINT

## THE PARTIES

13.   Plaintiff Laura Byrnes is a natural person who is a resident of Sicily, Italy.

14.   Defendant Micheline Pitt is a natural person and is a resident of Los Angeles County, California.

15.   Defendant Micheline Pitt Design, Inc., is a California corporation, with its headquarters in Burbank, California.

## FACTUAL BACKGROUND

16.   To truly understand the lengths that Pitt has gone to terrorize Byrnes, an understanding of the history of PUG is critical.  Pin Up Girl Clothing was founded in 1997 by Laura Byrnes.  She then launched "pinupgirlclothing.com" in 1999.  Byrnes, who did not receive any formal training in fashion design,[1] entered this business out of necessity.  Her origin story as the pioneer behind PUG came from necessity—she made clothes for herself and her daughter to wear on a day-to-day basis.  What started as an affordable and practical way to clothe herself and her daughter turned into a multi-million-dollar movement and business.  Where many before had failed, Byrnes had a unique eye that spoke to women and girls across the country.

17.   So, what is Pin Up Girl?  Byrnes created a real-world version of what she had seen on vintage pinup ephemera.  PUG specialized in vintage-inspired clothing and embodied the "pinup" style that enamored Byrnes for years.  Byrnes took her own mission of body positivity and inclusivity, the hallmarks of Pinup Girl Clothing, and applied it very broadly.

18.   Pinupgirlclothing.com was one of the first companies to do more than pay lip service to the idea that beauty is not a size, shape, color, gender, ability or age, and regularly featured models from size Extra Small to 4X to showcase their designs.

---

[1] Byrnes attended the Fashion Institute of Technology for four months and majored in Fashion Photography.

- 5 -

COMPLAINT

In Byrnes' own words: "We believe that all women deserve the right to look and feel beautiful.  Our clothing is made to empower women, allowing them to [be] the best versions of themselves."[2]

19.    It was Byrnes' desire to uplift women that made her a great mentor.  Her desire to uplift women and provide mentorship is what she wanted for her employee and nearly decade-long collaborator, Micheline Pitt.  Byrnes provided Pitt with access to her vendors and professional relationships.  As time went on, Byrnes trusted Pitt with more and more responsibilities.  Byrnes ultimately invested years into Pitt's professional development.  This included allowing Pitt to create her own designs under her own sub-brand and sell it under the banner of PUG.  Sadly, that would prove to be a critical mistake.

20.    With the increased responsibility Byrnes bestowed on Pitt, Pitt attempted to reform PUG in her own image.  Pitt started small.  *First*, she prioritized her own designs on the company website, making sure that all visitors to the PUG site would see her brand designs before anything else.  Then, Pitt escalated.  Pitt started seeking new relationships with vendors and altering how PUG interacted with its long-term vendors.  Pitt also inserted herself into the financial mechanics of PUG, which she had no authority to do.  From Byrnes' perspective, Pitt was essentially in the process of a hostile takeover.

21.    Of course, Byrnes fought to retain her company and the brand image she spent years cultivating.  Byrnes, ever the supportive mentor, tried to resolve these issues amicably with Pitt.  Pitt, ever the antagonist, refused to take accountability for her hostile acts.  Byrnes suspected that Pitt had been planning to launch her own competing brand during the time she engaged in this hostility, including by poisoning Byrnes' relationship with her vendors and suppliers.  Lo' and behold, within a few

---

[2] *Our Story*, Pinup Girl Clothing, https://pinupgirlclothing.com/pages/our-history (last visited May 12, 2026).

- 6 -

COMPLAINT

months, Pitt left PUG and launched her own competing brand—Vixen, by Micheline Pitt.  The hostile takeover morphed into a secession.

22.    Unsurprisingly, given Pitt's underhanded planning, after Vixen's launch, Vixen used the same vendors, fabric suppliers, markers, graders, contractors, textile print house, and factory as PUG, to name but a few.  Pitt went so far as to hire several former PUG employees for key positions at Vixen.  Pitt could not have PUG, so she attempted to create her knock off version.

## I.    Pitt's Defamation Campaign

23.    After Pitt's resignation in 2016, she began a public, defamatory smear campaign against PUG and Byrnes in an attempt to injure PUG and build up her new brand, Vixen.  Pitt's online defamatory statements included the following inflammatory allegations: PUG did not pay its vendors or employees; Byrnes racially insulted and physically threatened factory workers at the facility of PUG's principle manufacturer; Byrnes bought the domain name to her brand, "vixenbymichelinepitt.com", and redirected the domain to a Psychology Today article about female bullies; PUG bought the domain for the Vixen website in order to post negative comments on it; and PUG fired an employee while his mother was dying. These statements were all untrue.  In addition, Pitt made false, defamatory statements to PUG's (now former) customers who subsequently publicly posted the false information online, including on PUG's online customer chat room.

24.    Pitt's past comments severely damaged PUG's business.  This was evident from the posts themselves which PUG customers saw and commented on, many of them publicly swearing they would stop buying PUG products (and subsequently did stop buying from PUG).  Because Pitt's smear campaign turned Facebook (formerly PUG's primary advertising site) into a toxic environment, PUG had to increase its costs and efforts to find new ways of advertising.  After Pitt's campaign began, numerous employees, freelance artists, models, talent, and vendors broke ties with PUG.

COMPLAINT

25.     PUG had previously estimated that Pitt's defamatory campaign caused lost profits and incurred reputational damages in excess of $250,000.

26.     This is but a small glimpse into the harassment Byrnes endured.  Some additional pointed examples that elucidate Pitt's pattern of defaming and harassing conduct are as follows.

27.     On June 22, 2019, Pitt posted an image of a PUG textile on Instagram stories containing the text: "My original art that I retired and discontinued.  Since starting Vixen I knew I wanted to take MY art and make something better."  For long time customers and followers of PUG, Vixen, Pitt, and Byrnes, this was an obvious swipe at Byrnes, implying that Byrnes was appropriating Pitt's ideas and concepts.

28.     Pitt's defamatory barrage resulted in the amplification of her false statements from other online users connected to her.  On March 19, 2021, Instagram user "pitacakes" tagged Byrnes in a post.  The post said: "@pinupgirlclothing and @laurabyrnes trying to be all inclusive after her racist snafu years ago cracks me up.  Stop buying from this company.  Trash is trash is trash."  At the time, Byrnes noticed that the user "pitacakes" did not follow her on Instagram but rather followed three social media accounts controlled by Pitt at that time ("vixen_burbank," "vixen_by_micheline_pitt" and "michelinepitt").  It is obvious that the user "pitacakes" learned of these false claims from Pitt, amplifying Pitt's lies to a broader social media audience.  The seeds of disparagement by proxy started to sow in Pitt's mind.

29.     Baseless allegations of racism aside, Pitt and her affiliates also made false allegations of theft and copyright infringement.  On March 16, 2021, someone named Jessica Marshall commented on a post of a dress in Byrnes' Facebook group: "So, basically it's the Vixen Vacation dress, designed by Micheline Pitt . . . Huh."  At the time, Jessica Marshall followed Pitt and was a member of her Vixen Customer Facebook Group, "The Vixen's Salon," and therefore had been exposed to Pitt's original disparaging claims made against PUG and Byrnes.

- 8 -

COMPLAINT

30.     Pitt has a Facebook Group with over 14,000 members for her Vixen brand.  She also has a Facebook Page with about 113,000 followers.  Pitt's Facebook presence appears to be entirely related to the growth of her fashion brand; a fairly common phenomenon in today's social media market.  Pitt herself is not a "public figure" in the traditional sense of the term, nor does she hold herself out to be.  Pitt does not use her Facebook platform to speak on matters of public concern or interest.

31.     Pitt made posts on her Facebook Page in March 2019, May 2019, December 2019, and twice in July 2020, with derogatory references to Byrnes and/or PUG.  These posts suggested a range of defamatory allegations which included that Byrnes had attempted to prevent Pitt from succeeding and had stolen Pitt's product ideas.  At the time, Pitt's Facebook Group had no rules on disparaging Byrnes or PUG or using Byrnes' name or the PUG name or brand in a disparaging manner.  By contrast, Byrnes' Facebook Page of over 800,000 followers and her Facebook Group with over 40,000 members had strict rules regarding mentions of Pitt or her brand, with an alert set up notifying Byrnes if the words "Micheline" or "Vixen" were ever mentioned in any post or comment in the group so that they can quickly delete any post mentioning Pitt.

32.     For several years, Pitt's followers have repeatedly attacked Byrnes, PUG, and their customers on social media.  These attacks have frequently, if not always, involved the same accusations as those Pitt levied publicly against Byrnes.

II.     **Pitt's History of Weaponizing Lawsuits Against Byrnes**

33.     While Pitt was still an employee of PUG, she helped create multiple textile designs for PUG to use in its product lines.  After her abrupt departure from PUG, Pitt disputed the ownership over these designs, which led to the filing of *Micheline Pitt et al. v. Pin Up Girl, Inc.*, Case No. 2:17-CV-04816, in which Pitt sought redress for Federal Trademark Infringement and other related claims.  The parties resolved this action through the 2019 Settlement Agreement.  One of the

COMPLAINT

critical terms of this agreement was a provision that the parties could not make disparaging statements about each other.

34.     The non-disparagement clause in the 2019 Agreement provided as follows: "The Parties agree that they will not disparage each other either verbally, in writing or though social media accounts owned or controlled by them."

35.     The 2019 Agreement also had a liquidated damages clause that provided: "The Parties to this Settlement Agreement represent, warrant, agree and acknowledge that irreparable injury will result from any breach of this Paragraph and that the non-breaching party will be entitled to an immediate injunction against the breaching party to prevent further injury and THE NON-BREACHING PARTY SHALL BE ENTITLED TO AN AWARD OF LIQUIDATED DAMAGES IN THE AMOUNT OF FIVE THOUSAND DOLLARS ($5,000) FOR EACH SEPARATE VIOLATION OF THIS PARAGRAPH."

36.     Ostensibly, the 2019 Settlement Agreement should have put to rest the dispute between Byrnes and Pitt.  Unfortunately, Pitt's bloodlust was unsatiated, and on February 19, 2021, Pitt filed a complaint for breach of contract in the Los Angeles Superior Court in the action entitled *Micheline Pitt, et al. v. Laura Byrnes, et al.*, Case No. 21STCV06661.  Similar to the 2019 Agreement, the parties resolved this dispute through settlement.  The 2021 Settlement Agreement, which had an effective date of October 18, 2021, also contained a non-disparagement clause, but it had a particular distinctive difference.  The scope of the 2019 Agreement seemed only to prohibit direct non-disparagement by the parties, including through social media accounts "owned or controlled by [the parties]."  Conversely, the 2021 Settlement Agreement expanded the scope of the non-disparagement clause to capture disparagement through "proxies."

37.     The provision provided, in full:

The Parties agree that they shall neither directly *or through proxies* make any oral, written or electronic statement to any

- 10 -

COMPLAINT

person or entity that criticizes, ridicules, is derogatory of, or otherwise disparages the other Party, their goods or their services, whether they contend such statements are true or false and/or whether such statements are matters of fact or opinion. The Parties hereby acknowledge and agree that this provision and the enforcement of this provision does not violate their First Amendment rights and each Party hereby waives any argument to the contrary. This non-disparagement agreement shall not in any way prevent the Parties from disclosing any information to their attorneys, or from honestly answering questions or providing information in response to a lawful subpoena or court order.

(emphasis added).

38. Shortly thereafter, on November 5, 2021, the Los Angeles Superior Court entered a preliminary injunction that, in sum and substance, stated:

Defendants Laura Byrnes, Laura Byrnes Design, Inc., and Pin Up Girl, Inc. (collectively, "Byrnes Parties"), on the one hand, and Plaintiffs Micheline Pitt and Micheline Pitt Design, Inc. (collectively, the "Pitt Parties"), on the other hand, either directly or through proxies, are permanently RESTRAINED AND ENJOINED from making any oral, written or electronic statement to any person or entity that criticizes, ridicules, is derogatory of, or otherwise disparages the other party or any business owned or managed by them, their goods or their services, whether they contend such statements are true or false and/or whether such statements are matters of fact or opinion . . . .

- 11 -

COMPLAINT

In effect, the court enjoined the parties from disparaging each other pursuant to the terms of the 2021 Agreement.

39.    Pitt and Byrnes both understood the purpose of the introduction of the "proxy" language in the 2021 Agreement.  Byrnes had been experiencing an onslaught of disparagement through Pitt's friends, followers, fans, and agents, and Byrnes was trying to put a stop to it.  Because Pitt herself had stopped disparaging Byrnes directly towards the end of 2019, Byrnes was eager to put a stop to Pitt's "workaround" of the language in the 2019 Agreement.  The 2021 Agreement did not define the term "proxy," but its application was intended to be broad.

40.    After four years of litigation silence, Pitt, seemingly bored, popped up again and sued Byrnes in Los Angeles Superior Court.  The events surrounding Pitt's latest lawsuit and the events post-dating that suit are the subject of this Action.

**III.    Pitt's Latest Harassing Lawsuit Against Byrnes**

41.    On February 7, 2025, Pitt filed an Ex Parte Application for an Order to Show Cause in Los Angeles Superior Court.  Pitt's filing asked the Court to hold Byrnes in Contempt for allegedly violating the preliminary injunction.  To Byrnes' dismay, Pitt intentionally dragged Byrnes back into the endless vortex of litigation, which Byrnes had put behind her and even moved to another continent to steer clear of.

42.    Pitt's lawsuit, of course, is based on an erroneous centering of herself in Byrnes' life.  In January 2025, Byrnes, who has an audience of over 200,000 followers on TikTok, responded to a comment question on TikTok asking her how she started her company.  Many found Byrnes' story inspiring, and so responding to a question about her company's origin story seemed nothing but benign.

43.    Byrnes recorded and shared a six-part video series on TikTok discussing her company's birth, tenure, and eventual closure.  Byrnes spoke at a high level, explaining her experience in non-specific generalities.  She intended to provide an honest account of her business' life story but wanted to make sure she did not single

- 12 -

COMPLAINT

out specific individuals as she explained her story. Byrnes spoke reflectively about the realities of running a small but growing fashion business, including leadership pressures, business setbacks, and the challenges of managing creative personalities.

44. For example, in the second chronological video of this six-part series, Byrnes recounted an experience with an employee that was hiring individuals absent authorization and the difficulties Byrnes experienced trying to curb this individual's behavior. Byrnes never named that employee in her video, and that video had nothing to do with Pitt. Pitt, of course, assumed it did. She was wrong. In fact, throughout Byrnes entire TikTok series, Byrnes avoided naming any former employees, collaborators, competitors, or adversaries. Instead, her goal was to give a general overview of her business in a collective manner, blending experiences that spanned over a decade into less than an hour. The truth is: the videos are not about any one person, and viewed objectively, it is difficult to come to any other conclusion. They really are about Byrnes explaining her experience.

45. Pitt, who Byrnes did not even know would be watching these videos, only saw herself in *everything*. But how did Pitt even come across these videos? Pitt and Byrnes are not friends on any social media platform. Their audiences have minimal overlap. In fact, Byrnes has blocked Pitt and anyone she knows that is associated with Pitt from viewing her social media. It's obvious that Pitt is still monitoring Byrnes' actions, even after Byrnes had decidedly moved on from her, and she must be using desperate tactics to evade Byrnes' block.

46. But Pitt won't let Byrnes move on. Worse, still, after Pitt somehow got wind of the videos and assumed (wrongly) that the videos were about her, instead of even trying to clear up any misunderstanding with Byrnes directly, Pitt ran to the California Superior Court, eager to try and extract more settlement funds from Byrnes.

47. That action is dormant in that Court because Pitt has failed to comply with the Court's instruction to serve Byrnes.

- 13 -

COMPLAINT

## IV.    Pitt's Parallel Harassment of Byrnes

48.    As Pitt was weaponizing the legal system against Byrnes like she always does, she also deployed her proxies to re-initiate their disparagement of Byrnes and tarnish the reputation of her former business, PUG.  Indeed, it had been approximately three years of quiet, and on the ***very same day*** that Pitt filed her lawsuit, the avalanche of disparagement resumed.  That is no coincidence.

49.    While it may have been debatable whether such conduct violated the 2019 Agreement, there is no doubt that it violated the 2021 Agreement, which specifically modified the non-disparagement clause to prohibit disparagement by proxy.  So, who are the Pitt Proxies?

A.    The Agents of Pitt's Cyber Harassment

50.    In addition to Pitt's public facing social media accounts described above, Pitt maintains a personal Facebook account with a highly limited network consisting of only fourteen connections.  She has publicly stated on that account that she uses it solely to maintain her business profiles and for matters directly related to her work, indicating that the account is reserved for close personal or professional contacts rather than casual or social use.  The nature of Pitt's relationships with the individuals connected to this account substantiate that Pitt enlisted some of these individuals to harass Byrnes.



51.    The 2021 Agreement's non-disparagement covenant is breached not only by Pitt's direct disparagement, but also by disparagement made "through proxies"—a

- 14 -

COMPLAINT

term the parties expressly added to the 2021 Agreement.  Pitt acts "through proxies" within the meaning of the 2021 Agreement where Pitt directs, encourages, ratifies, adopts, or otherwise affirmatively amplifies disparaging statements made by third parties.  Under California law, ratification and adoption do not require a formal agency relationship; a principal ratifies an agent's acts by knowingly accepting the benefits of those acts, by failing to disavow them despite knowledge and the ability to do so, or by affirmatively endorsing them through conduct such as public engagement with the underlying content.  Pitt's conduct with respect to each of the individuals identified below—including, without limitation, her ongoing personal and professional relationships with them, her affirmative engagement with their disparaging content, and her failure to disavow that content despite plain knowledge of it—satisfies the 2021 Agreement's "proxies" prohibition under one or more of these theories.

52.     First on the list of Pitt's proxies is Ashley Baucham a/k/a "Ashleeta Beauchamp" ("Baucham").  Baucham is one of the fourteen connections on Pitt's personal Facebook account.  Baucham is also a good friend of Pitt, who Pitt has trusted to model for Vixen.  Baucham is a contributing editor at The Vintage Woman Magazine, an online publication relevant to the exact type of style and brand of both Vixen and PUG.  Pitt's relationship with Baucham spans over a decade, and, in that time, Baucham has parroted false and disparaging statements about Byrnes that she could have only got from Pitt.



- 15 -

COMPLAINT

53.    To really understand Baucham's critical role in the scheme to disparage Byrnes, a brief recap of Baucham's history with both Byrnes and Pitt is necessary.  In 2016, Baucham was a friend of both Pitt and Byrnes, and a happy customer of PUG.  She often posted on social media with praise and attitude that Byrnes and PUG were making her clothing dreams come true.

54.    After Pitt departed PUG, Byrnes and Baucham remained friends for approximately six months, even after Pitt started disparaging Byrnes publicly.  In January 2017, Byrnes "unfriended" Baucham on social media.  Immediately after doing so, Baucham became one on Pitt's primary disparagement mouthpieces, accusing Byrnes of racism, cultural appropriation, and abuse in general.  Indeed, she went so far as to lead a boycott campaign against PUG.

55.    Over the next four years, until 2021, Baucham disparaged Byrnes on Pitt's behalf with regularity.  Baucham stopped her disparagement of Pitt after Byrnes referenced Baucham in Byrnes' response to Pitt's compliant in 2021.  Thereafter, Baucham helped Pitt enlist other proxies to continue to do Pitt's dirty work.  So started the pattern of trying to distance Pitt from the wrongdoing, but by maintaining the core objective—disparaging Byrnes.

56.    Enter, Regina Luz Jordan a/k/a Instagram user "thevintagebonita" ("Jordan"); the second person on the list of proxies.  Baucham is the connection between Pitt and Jordan.  Like Baucham, Jordan is a contributor to The Vintage Woman Magazine, according to Jordan's publicly available professional profile on LinkedIn.



COMPLAINT

57.    Jordan is also an editor of another publication, *Hollywoodland News*, which has featured Baucham.[3]  This further reflects the ongoing professional collaboration between Baucham and Jordan within the same media network.

58.    Upon information and belief, Pitt is connected to Jordan through Baucham, a close personal associate of Pitt.  Baucham and Jordan's clear professional relationship, including overlapping roles as contributors within the same vintage fashion media ecosystem, provided a clear conduit for Pitt's narrative about Byrnes and PUG to be transmitted to Jordan.  Following this introduction, Pitt knowingly affirmed and directed Jordan's ongoing disparagement of Byrnes and PUG.  Pitt also engaged in conduct that publicly endorsed Jordan's disparaging content through likes, reactions, and other affirmative online engagement, thereby signaling approval of Jordan's conduct; in fact, motivating it and encouraging it.  Pitt's failure to disavow or distance herself from Jordan's statements, combined with affirmative engagement, constituted ratification and encouragement of Jordan's actions.

59.    Third on Pitt's list of proxies is Hope Johnstun ("Johnstun").  Pitt is connected to Johnstun through Jordan.  As demonstrated in more detail below, Pitt enlisted Jordan directly to take on the most aggressive disparagement campaign against Byrnes.  In so doing, Jordan, on behalf of Pitt, further enlisted Johnstun to disparage Byrnes.  Upon information and belief, Johnstun and Pitt have the same interests, run in the same fashion circles, both have a history with PUG, and have since developed a quasi-professional relationship.  While there remains a small degree of separation, it is that separation that makes her the perfect proxy for Pitt— *i.e.*, it creates the illusion of Pitt's non-involvement.  In truth, Pitt is the puppet master.

---

[3] *June-Tease: Beautiful Black Burlesque & the Power of Reclamation*, Hollywoodland News (June 29, 2025), https://www.hollywoodlandnews.com/june-tease-black-burlesque-2025

COMPLAINT

60.    Fourth on the list of proxies is Ryann Maegen Hoven a/k/a "Tess Holliday" ("Hoven").  Hoven's relationship with Pitt began in 2011, when they met in person at a supermarket in Los Angeles.  They became friends and continue to stay in contact in person and online.  Pitt and Hoven's relationship also bled into Pitt's work life.  Going back to Pitt's time at PUG, Pitt selected Hoven to model some of PUG's clothing.  Following Pitt's resignation from PUG, upon information and belief, Hoven continued to model for Pitt's new brand "Vixen."  Pitt's professional and personal relationship with Hoven continues to this day.

**Micheline Pitt - Vixen by Micheline Pitt's Post**                    ✕

 **Micheline Pitt - Vixen by Micheline Pitt**                    ...
December 28, 2011 · 🌐

The very beautiful Tess Munster-Plus Model came in for a fitting here  Pinup Girl Clothing headquarters. We will be expanding to 3x and 4x for 2011 in certain styles and colorways in all of our housebrands and she will be our new model! ❤️

👍 113                                                    37 comments  2 shares

61.    Fifth on the list of proxies is Karianne Lauer, a/k/a Instagram user "miss_sneakytiki" ("Lauer").  Upon information and belief, Lauer's relationship with Pitt began prior to July 2024, when Pitt posted a photo of Lauer to her (Pitt's) Instagram account and tagged Lauer.  They became friends thereafter and continue to stay in contact in person and online.  Pitt's personal relationship with Lauer continues to this day.

62.    Lauer is also connected to Jordan, another of Pitt's proxies.  On a February 17, 2025, Instagram post which contained a disparaging "infographic" about Byrnes and PUG (pictured below), Lauer replied to Jordan, thanking her for her "research."

COMPLAINT



### B.    The Disparaging Conduct of Pitt's Proxies

#### i.    *Jordan*

63.    By far Pitt's most active proxy has been Jordan.[4]  Within the last fifteen months, Jordan has made numerous disparaging comments against Byrnes.  Jordan has used multiple mediums to disparage Byrnes, including the various publications for which she is a contributor and through social media.  In February of 2025, Jordan began a targeted smear campaign against Laura Byrnes and PUG.  This was all done for Pitt's benefit.

64.    "We're cancelling this shit."  So began Jordan's smears against PUG and Byrnes.  On February 7, 2025, **the very same day that Pitt filed her newest legal action against Byrnes**, Jordan made a post claiming that PUG's materials and clothing were cheap counterfeits and poor quality.  Accusing PUG of being inauthentic and lacking quality is per se disparaging.  Further, in the post, Jordan used

---

[4] Attached hereto as **Exhibit A** is a collection of all of Jordan's statements referenced in this Complaint.

COMPLAINT

the hashtag "boycottpinupgirlclothing."  This hashtag urges the public to cease doing business with PUG, implying wrongdoing or unethical conduct on PUG's part.



♡ 92   💬 26   🔁   ✈ 45

**thevintagebonita** Y'all need to stop buying PUG and tell your friends that they are reselling you product from places like AliExpress, SHEIN and Fashion Nova and marking it up exorbitantly. This is unacceptable from a brand that many people love to expect that people in the pinup community are stupid, clueless or are to financially taken advantage of. And for what? A 75% markup.

Y'all we are better than this. You are all smarter and better than a clothing company taking advantage of your hard earned money and your commitment to the brand. Boycott and take a stand against fast fashion disguising itself as a fashion brand you love.

Share this with your besties, fam. We're cancelling this shit.

#boycottpinupgirlclothing #boycottfastfashion #pinupcommunityunite

February 7, 2025

65.    On February 8, 2025, **the very next day**, Jordan made another post about Byrnes.  It included various disparaging statements in the caption, including alleged "reports of quality issues" and "[b]usiness filings show red flags—changes in corporate status, behind on paperwork."  These statements are misrepresentations of PUG as a struggling business, taking shortcuts, and providing low quality garments to consumers, all of which damage PUG's legacy and Byrnes as a leader.

66.    In addition to her own direct disparagement, Jordan "liked" multiple comments disparaging Byrnes on this post, including one claiming that PUG has "culturally appropriated" their style.[5]  Cultural appropriation, in today's climate, is a sin worse than embezzlement in the eyes of many, thus demonstrating the disparaging nature of this comment.  It is worth noting that "liking" replies on Instagram is known

[5] Ex. A at 3–4.

- 20 -

COMPLAINT

to prioritize them in the site's algorithm, promoting them by making those replies more visible to individuals who interact with the original post.[6]



67.    On this same February 8, 2025, post, Jordan also liked a comment that stated that people were "harassed by pinup girl clothing owner."  She replied to it and said that she hoped that "people can come to me with their stories."  Jordan also liked a comment that stated that Byrnes' "admins" who "ran the Facebook group" were "incredibly rude" and would "invade peoples privacy."  These comments are disparaging because they accuse Byrnes of harassing others and portray Byrnes' business and her management of it as abusive and unethical, thereby attacking her personal integrity and professional reputation.  Furthermore, these statements invite the public to view Byrnes and her company as dishonest and predatory.

68.    On February 12, 2025, Jordan made another post about Byrnes claiming that Byrnes sold her successful company to avoid getting in legal trouble in California for selling products that contained chemicals "linked to cancer, birth

---

[6] Video posted by Business Insider (@biz.insider), INSTAGRAM, "Adam Mosseri reveals how the Instagram algorithm actually works" (Oct. 4, 2025). https://www.instagram.com/p/DPZgiYbjFN-/?img_index=2.  Mosseri has been "Head of Instagram" since October 2018.

COMPLAINT

defects, and reproductive harm." This false and obviously harmful statement was very damaging. In fact, the belts mentioned in Jordan's posts were not even on PUG's website at the time she claims Byrnes was selling them. Critically, Byrnes complied with all of her obligations pursuant to Prop 65.

69.    In the same post, Jordan suggested that Byrnes was "offloading her intellectual property" so she could "cash out before the legal hammer dropped." These statements are clearly disparaging because they falsely accuse Byrnes of serious legal and regulatory misconduct, including knowingly selling dangerous products and acting dishonestly to avoid legal accountability, all of which directly impugn her integrity, business ethics, and adherence to moral and legal standards. These statements are plainly made to damage Byrnes' reputation and deter others from doing business with her in the future.

COMPLAINT

70. On February 14, 2025, Jordan made another post about Byrnes discussing the lawsuits between Pitt and Byrnes. In the caption of that post, Jordan used the hashtags "boycottpinupgirlclothing" and "boycottlaurabyrnes" and "justiceforpinups." These hashtags were disparaging to Byrnes because Jordan was implying that Byrnes had engaged in conduct that warranted a boycott. Indeed, in the context of Jordan's other posts, and with the added misrepresentation that Jordan was merely parroting facts from court documents, Jordan's statements and the hashtags were particularly disparaging to Byrnes. In addition, Jordan liked a comment stating that PUG stole Pitt's designs and Jordan went as far as to reply and say that this was true and Jordan had "many anonymous former pug employees" who told her they had things stolen from them too. Jordan's amplification of this comment demonstrates her contribution to accusing Byrnes of a crime, which is an obviously disparaging statement.

71. On February 17, 2025, Jordan made an extremely disparaging "infographic" about Byrnes and PUG. This post was part of a similarly themed series of posts Jordan made in February of 2025. Jordan claimed the following:

- PUG used "shady business practices";
- PUG was a "scam operation";
- PUG used "gaslighting & deception";

COMPLAINT

- There were "allegations of abuse" as well as a "toxic culture";
- PUG had "unpaid refunds & wages"; and
- PUG had mistreated employees.

72.    In that same infographic post, Jordan again encouraged followers to boycott the brand and used the hashtags "boycottpinupgirlclothing" and "boycottpug."  Dozens of people commented on the post and shared it.  The numerous statements from the February 17, 2025, Instagram post were disparaging because they accuse Byrnes and PUG of fraud, deception, abuse, wage theft, and unethical business practices.  The accusations directly attack the company's integrity and portray it as harmful to both employees and consumers.  By once again encouraging the public to boycott through the hashtags, Jordan further amplified these accusations and sought to damage Byrnes' public reputation, goodwill, and commercial relationships.



COMPLAINT

73.    Jordan also amplified the following disparaging comments by liking them: (1) a comment reply referring to a boycott of PUG because of "shady business practices, dishonesty, and current drop-shipped scamming," (2) a comment reply telling Jordan to "tear em down," (3) a comment reply saying Byrnes was "trash" and stating that Byrnes mistreated "both POC pinups and models."

74.    On February 22, 2025, Jordan made yet another post about Byrnes and PUG.  This time, Jordan claimed that Byrnes did not pay her employees and was regularly stealing from them.  In that post, Jordan stated that "Byrnes sued the California Labor Commissioner TWICE just to avoid paying a Mexican mother of three."  She again used the hashtags "boycottpug," "wagetheft," "fastfashionexposed," and "justiceforworkers," among several others.  These statements and hashtags are disparaging because, once again, they accuse Byrnes of criminal and unethical conduct but also employ inflammatory imagery and language to portray Byrnes as immoral and unfit to operate a business.  Jordan's post sought to incite public condemnation and economic harm through boycott-oriented hashtags, which again attacked Byrnes reputation, character, and professional standing.

COMPLAINT

75.     Jordan's claims grossly misrepresent PUG's proceedings before the California Labor Commissioner.  PUG challenged claims for unpaid wages from individuals with an entity called "sunset sewing," that Byrnes and PUG never did any business with.  There were dozens of complaints levied against PUG, and PUG successfully proved that it did not conduct any business with anyone in that company.  Unfortunately, two of the complaints were missed, and a judgment was entered against PUG.  PUG appealed those judgments on the same grounds as its defense of the other claims, *i.e.*, PUG never did business with "sunset sewing."  Jordan's statements do not reflect this reality; rather, they claim Byrnes was maliciously trying to avoid paying legally earned wages.  She was not.

76.     In the same post, Jordan liked multiple comments disparaging Byrnes including one that said, "utterly foul, shameful behaviour" and another that said Byrnes shouldn't be in business.[7]  These comments were made in response to the substance of Jordan's posts.  Jordan also replied to one comment referring to Byrnes as a "monster."[8]  In another reply, Jordan called Byrnes behavior "one of the worst and most shameful things I've ever read."

77.     On March 13, 2025, Jordan posted again about PUG.  This time, Jordan suggested that "legal reasons" prevented her from "dropping all 13,000 words" of her writing on PUG and Laura Byrnes.  Importantly, Jordan wrote that "I'm always willing to answer any questions on this topic, though, so hmu [hit me up]."  Upon information and belief, Jordan's reference to unnamed "legal reasons" was a direct allusion to Byrnes' then-recent TikTok posts, which themselves are already the subject of litigation initiated by Pitt.  Jordan's invocation of legal constraints tied to that litigation—combined with her continued solicitation of private inquiries about the same subject matter—demonstrates Jordan's awareness of Pitt's lawsuit and its

---

[7] Ex. A at 10–11.
[8] *Id*. at 8.

COMPLAINT

purported restrictions, thereby lending further credibility to the conclusion that Jordan was acting with knowledge of, and in coordination with, Pitt and her interests. This conduct is consistent with Jordan functioning as a proxy to continue disseminating Pitt-aligned narratives while attempting to evade direct legal accountability. Clearly, Jordan knew what she was saying was disparaging, but she made herself accessible to anyone who might be interested in hearing her lies and slander about Byrnes.

78.    On April 11, 2025, Jordan posted yet again about Byrnes and PUG. Jordan suggested that PUG was trying to "cover-up" its history with Byrnes. Jordan wrote that "[t]he designers, customers, and community that built this brand . . . [are] still waiting on refunds, recognition or a basic apology." She also wrote that while the company had changed names, it has the "[s]ame shady legacy." She again used the hashtag "boycottpug," as well as "corporateaccountability," "protectyourcommunity," "stoperasingcreators," "supportrealdesigners," "designcreditisdue," and "ethicalfashion." Jordan here reiterates false and disparaging statements that Byrnes and PUG ripped off the fashion community and consumers.

- 27 -

COMPLAINT



79.    On April 12, 2025, Jordan posted about her upcoming story in her publication, *Hollywoodland News*, about "unpaid labor" surrounding PUG and Laura Byrnes.  Jordan used the hashtags "ethicalfashionmatters," "designerrights," "payyourpeople," "scandaldrop," and "justiceinfashion," which all suggested again that Byrnes had been a bad actor who harmed designers.  Jordan ended the post by writing, "Have your own story to tell?  My inbox is open," suggesting that she would gladly publish additional disparaging information about Byrnes.

80.    On April 13, 2025, Jordan posted screenshots of her publication on *Hollywoodland News*.  Jordan wrote that Byrnes made a "fashion empire built on 'empowerment'" while "ghosting the women who built it."  Jordan used numerous disparaging hashtags again, including "unpaidlabor," "creativeexploitation," "exposefashion," "artnotexploitation," "designersdeservecredit," "exposingthetruth,"

- 28 -

and "fashionscandal."  These hashtags were all intended to disparage Byrnes and suggest she had exploited and harmed her employees.  Jordan had conducted an interview with Hope Johnstun, another of Pitt's proxies.



81.    Jordan's "interview" with Hope Johnstun (another one of Pitt's proxies), which she posted publicly to her website *HollywoodlandNews.com*, contained numerous inflammatory, untrue, and disparaging statements about Byrnes, who is mentioned by name fourteen times in the article.[9]  Jordan stated that "Byrnes spent years engaging in targeted online harassment."  Jordan also stated that Byrnes was "sipping wine in Italy" while making money from "the unpaid labor of women like Hope Johnstun."[10]

---

[9] *Used, Unpaid, and Undermined: Hope Johnstun on Pinup Girl Clothing*, Hollywoodland News (Apr. 13, 2025) https://www.hollywoodlandnews.com/hope-johnstun-pinup-girl-clothing/ (Last accessed April 15, 2026).
[10] The entire article is reproduced in Ex. A at 16–45.

COMPLAINT

82.     After Jordan's conversation with Johnstun, which was the basis of the piece, Jordan wrote that the "messy collapse of Pinup Girl Clothing" was "a masterclass in how not to treat the very women who made you matter."  Jordan also included a screenshot of what she claimed to be unpaid invoices totaling $225,267.02 with an overlaid text that reads "An actual financial record sent to me from an anonymous source."  That list of unpaid invoices was actually a list of checks that PUG had paid out.  In other words, Jordan wrongly recharacterized money that PUG rightfully paid to individuals and claimed that it was money PUG owed.  And the cherry on top of her sundae of disparaging statements about Byrnes is that Jordan concluded "Hope Johnstun was trying to prevent further exploitation of her art.  She doesn't name names.  She doesn't need to.  The pattern speaks for itself."

83.     These statements are plainly untrue.  Byrnes did not engage in targeted online harassment, did not exploit unpaid labor, and did not operate her business in the manner Jordan and Johnstun claimed.  The purported invoices referenced by Jordan were presented without context, authentication or verification, and the insinuation of systemic nonpayment and exploitation is untrue.  All of these claims are clearly disparaging because they suggest dishonesty and unethical and illegal conduct by both Byrnes and PUG.  Jordan and Johnstun frame Byrnes as an unfeeling and uncaring monster and aim to hurt her reputation and any future ability to do business.

          ii.     *Johnstun*

84.     Johnstun, also acting as a proxy for Pitt, disparaged Byrnes numerous times in her interview with Jordan for Jordan's publication *Hollywoodland News*.  Some of those disparaging statements are listed above in the discussion of Jordan's article.  In addition to those numerous statements, Johnstun further complained that Byrnes did not pay her and that Byrnes' company "claims to be here for female empowerment and to support women," but ultimately PUG/Byrnes did not pay the women who worked for them.  Doubling down on her claims, Johnstun said that "for

- 30 -

COMPLAINT

several years, they have been selling products, and instead of taking the percentage out of each sale and giving it to the person who they signed a contract with who designed that thing, they just have kept all of the money." Again, this statement was false, harmful, and disparaging because they suggest that Byrnes is a thief and a person who conducts business in an unethical manner.

85. Additionally, on Jordan's Instagram post referencing Byrnes from February 17, 2025, Johnstun replied to a comment from Hoven, saying "Pinup Girl Clothing still owes me money for designing for them. Would you (Hoven) consider speaking out publicly with me to help amplify my message?"[11] This statement is disparaging to Byrnes because it suggests she had not been paying creatives for their services, which is simply untrue. It is worth noting here that Hoven has over 2.5 million followers on Instagram, so this claim was amplified and accessible to a massive number of people.

86. Around March 2026, Johnstun posted a video to TikTok where she stated that Byrnes had stolen her design for a dress. Johnstun stated that "It looks like Pin Up Girl Clothing and Laura Byrnes allegedly can't do anything new without stealing the idea from me first." The video was cross posted to Instagram, but, as of the filing of this Complaint, both videos have been removed from both platforms. Upon information and belief, the videos were up long enough to be viewed by multiple people on both platforms. This disparaging statement by Johnstun is categorically untrue and harmful to Byrnes. It accuses Byrnes of being an "idea thief," a theme consistent with Pitt's disparagement campaign against Byrnes.

*iii.    Lauer*

87. Lauer's disparaging statement of Byrnes came in the form of a comment on Jordan's February 7, 2025, Instagram post, referenced in paragraph 57. Lauer, aka

---

[11] Attached hereto as **Exhibit B** is a collection of all of Johnstun's statements referenced in this Complaint. *See also* Ex. B at 1.

COMPLAINT

Instagram user "miss_sneakytiki," left a comment reply on Jordan's post, explaining that she "stopped paying attention to pug after micheline left" and that PUG was "next level disgusting."[12]  Each of these statements is undoubtedly disparaging, going to the heart of PUG's ethical standing, dignity, and quality.

88.     It is worth noting that Jordan liked this comment, which, as explained above in relation to similar conduct vis-à-vis other commenters, elevated that comment above comments that did not receive engagement, thus contributing to its visibility to the post's social media audience.  In so doing, Jordan effectively amplified Lauer's disparaging comments that PUG "was next level disgusting" through her conduct.

> iv.     *Hoven*

89.     Hoven's disparagement of Byrnes and PUG came in the form of a comment on Jordan's February 17, 2025, infographic Instagram post.  Hoven's comment called Byrnes a "bully, a liar, and a monster."[13]  Comments of this nature that cut to the heart of a person's character are clearly disparaging.



---

[12] Attached hereto as **Exhibit C** is a collection of all of Lauer's statements referenced in this Complaint.

[13] Attached hereto as **Exhibit D** is a collection of all of Hoven's statements referenced in this Complaint.

COMPLAINT

90. It is worth noting too that Jordan pinned this comment to the top of the comments on her Instagram post. The effect of "pinning" ensures the comment's visibility to everyone who clicks on the post. In effect, Jordan was republishing the comment.

v. *Baucham*

91. Finally, the last of Pitt's proxies is Baucham. Baucham is uniquely situated because, as mentioned above, most of her disparaging statements pre-date the relevant contract here, the 2021 Settlement Agreement. Baucham has previously made the following disparaging comments about Byrnes. For example, Baucham claimed that Byrnes mocked a survivor of child rape, including on January 31, 2018, when Baucham stated that Byrnes mocked a child abuse survivor.[14] In addition, on June 8, 2020, Baucham made a post on Facebook disparaging Byrnes and calling her and PUG racist.[15]

92. Baucham's role in this course of disparaging conduct continues. Upon information and belief, she is one of Jordan's primary sources of information making her a perpetrator of disparaging statements to Jordan, who then relays it to the public. Baucham, who is close to Pitt and an obvious proxy, acts as a conduit in extending the proxy chain from Pitt to Jordan. This chain is a straight line and offers no escape to Pitt should she attempt a lack of connection to Jordan.

## FIRST CAUSE OF ACTION

### *Breach of Contract*

93. Byrnes re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

---

[14] Attached hereto as **Exhibit E** is a collection of all of Baucham's statements referenced in this Complaint. *See also* Ex. E at 1.
[15] Ex. E at 2.

- 33 -

COMPLAINT

94.     Byrnes has clearly alleged the existence of a valid and enforceable contract.  Pitt and Byrnes entered into a Settlement Agreement on October 18, 2021.  Settlement agreements are enforceable contracts under California law, and the 2021 Settlement Agreement is supported by mutual and substantial consideration—including monetary consideration paid by Byrnes—and contains an express mutual waiver of any First Amendment objection to its enforcement.

95.     The 2021 Settlement Agreement included the following non-disparagement clause:

> The Parties agree that they shall neither directly or through proxies make any oral, written or electronic statement to any person or entity that criticizes, ridicules, is derogatory of, or otherwise disparages the other Party, their goods or their services, whether they contend such statements are true or false and/or whether such statements are matters of fact or opinion.  The Parties hereby acknowledge and agree that this provision and the enforcement of this provision does not violate their First Amendment rights and each Party hereby waives any argument to the contrary.  This non-disparagement agreement shall not in any way prevent the Parties from disclosing any information to their attorneys, or from honestly answering questions or providing information in response to a lawful subpoena or court order.

96.     Pitt breached this provision of the Settlement Agreement by directing, ratifying, encouraging, adopting, or otherwise affirmatively amplifying disparaging statements made through proxies, as delineated in this Complaint.  This breach constituted a material breach of the Settlement Agreement.  The history between the Parties, including prior contractual history, demonstrates that disparagement was a

- 34 -

COMPLAINT

key provision of the Settlement Agreement. That the scope of the provision was renegotiated from the 2019 Agreement is proof of this fact.

97. As a direct and proximate result of Pitt's breach of the non-disparagement provision of the 2021 Settlement Agreement, Byrnes has suffered damages including, compensatory damages, liquidated damages, special damages, including reputational harm, and other economic damages.

98. As agreed upon between Pitt and Byrnes, vis-à-vis liquidated damages, each disparaging statement demands a payment of $5,000. That means, at minimum, and excluding other damages amounts, Byrnes is due $355,000 in liquidated damages.

## SECOND CAUSE OF ACTION

### *Declaratory Relief*

99. Byrnes repeats and realleges each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

100. An actual and present controversy exists between the parties concerning the meaning, scope, and enforceability of the non-disparagement provision contained in the 2021 Settlement Agreement. That controversy is concrete and present: Pitt has filed and continues to maintain a contempt application in the Los Angeles Superior Court asserting that specific TikTok content published by Byrnes in January 2025 breaches the 2021 Agreement's non-disparagement covenant.

101. Specifically, Byrnes contends that the six-part TikTok video series she published in January 2025—which does not name Pitt and consists of generalized reflections on Byrnes' own business experience—does not constitute disparagement of Pitt within the meaning of the 2021 Agreement and therefore does not breach that Agreement.

102. Pitt's pending lawsuit in the Los Angeles Superior Court asserts that Pitt has a different understanding of the scope of the non-disparagement clause of the 2021 Settlement Agreement. Pitt believes that Byrnes is generally prohibited from

- 35 -

COMPLAINT

discussing any aspect of her former business, particularly if those references can be perceived to be about Pitt.  Pitt's construction would exceed the parties' contractual intent and would render the clause unenforceable as applied to Byrnes' January 2025 TikTok content.

103.   Byrnes therefore seeks a judicial declaration that her January 2025 TikTok video series, as published, does not breach the 2021 Agreement's non-disparagement covenant.

104.   Byrnes further seeks a judicial declaration that the language in the 2021 Agreement's non-disparagement covenant does not prohibit Byrnes from speaking generally about her former business, including experiences with former employees, provided those communications do not explicitly reference or mention Pitt.

105.   A declaration is necessary to resolve ongoing uncertainty and to prevent unnecessary future litigation.

### JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the relief delineated in the preceding paragraphs, and which can be summarized in general terms as follows:

A.    An award of damages against Pitt in an amount to be determined at trial, but not less than $1,250,000, which encompasses the following non-exhaustive list of applicable damages: compensatory damages, liquidated damages, economic damages, and any other applicable damages;

B.    An injunction and order against Pitt to take the necessary action to stop violating the non-disparagement clause through proxies;

C.    Prejudgment interest on all amounts due;

D.    An award of costs that Plaintiff has incurred in this action, including, but not limited to, Plaintiff's reasonable attorneys' fees and costs; and

- 36 -

COMPLAINT

E.    A judicial declaration that Byrnes' January 2025 TikTok video series, as published, does not breach the 2021 Agreement's non-disparagement covenant;

F.    A judicial declaration that the 2021 Agreement's non-disparagement covenant does not prohibit Byrnes from speaking generally about her former business, including experiences with former employees, provided those communications do not explicitly reference or mention Pitt.

G.    Such other and further relief as the Court may deem just and proper.

Dated: June 1, 2026

BROWN, NERI, SMITH & KHAN LLP

By:    /s/ Geoffrey A. Neri
       Geoffrey A. Neri
       Thomasin Bernhardt

       11601 Wilshire Blvd., Suite 2080
       Los Angeles, California 90025
       T: (310) 593-9890
       geoff@bnsklaw.com
       thomasin@bnsklaw.com

ChaudhryLaw PLLC

By:    /s/ Justin Mungai
       Justin Mungai
       *(Pro Hac Vice Pending)

       147 West 25th Street, 12th Floor
       New York, New York 10001
       Tel: (212) 785-5550
       justin@chaudhrylaw.com

       *Attorneys for Plaintiff*
       *Laura Byrnes*

- 37 -
COMPLAINT